

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed October 26, 2011**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TRIDIMENSION ENERGY, L.P., | § | CASE NO. 10-33565-SGJ-11 |
| *et al.*, | § | (Jointly Administered) |
|     DEBTORS. | § | |
| _____ | § | |
| JASON SEARCY, AS LIQUIDATING | § | |
| TRUSTEE OF THE TRIDIMENSION | § | |
| ENERGY, L.P.,*et al.* | § | |
| LIQUIDATING TRUST, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 11-03282 |
| | § | |
| SR ACQUISITION I, LLC, | § | |
|     DEFENDANT. | § | |

### MEMORANDUM OF OPINION AND ORDER GRANTING
### DEFENDANT'S MOTION TO DISMISS COMPLAINT

Before this court is the Motion of SR Acquisition I, LLC

(the "Defendant" or "SR") to dismiss the above-referenced

adversary proceeding ("Adversary Proceeding") for failure to

state a claim upon which relief can be granted (the "Motion to

Dismiss"), pursuant to Fed. R. Bankr. Pro. 7012 and Fed. R. Civ.

-1-

Pro. 12(b)(b)(6).  For the reasons set forth below, the court **grants** the Motion to Dismiss.[1]

A.  **Relevant Facts.**

1.  The following eight, related entities filed Chapter 11 bankruptcy cases in this court on May 21, 2010:  TriDimension Energy, L.P.; TDE Property Holdings, LP; Axis E&P, LP; Axis Onshore, LP; Axis Marketing, LP; Ram Drilling, LP; TDE Subsidiary GP LLC; and TDE Operating GP, LLC (collectively, the "Debtors"). The Debtors' bankruptcy cases were administratively consolidated under the above-referenced case number.

2.  As a strategy for the repayment of creditors, the Debtors pursued a sale of substantially all of their assets during their consolidated case, which assets were oil and gas properties, primarily in Louisiana and Mississippi (the "Assets").

3.  The Defendant, SR, was selected by the Debtors and approved by the bankruptcy court to be a "stalking horse bidder" based on an initial bid it submitted.   SR ultimately was the successful high-bidder, after a competitive bid and auction process during the Chapter 11 case, and purchased the Debtors' Assets pursuant to an "Asset Purchase Agreement," dated October

---

[1] The court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b) as it is a proceeding "arising in" a bankruptcy case.  This is a "core" proceeding under 28 U.S.C. § 157(b)(2)(A), (E) and (O).  The parties have all taken the position that core matters are involved herein.

18, 2010, as amended by an "Amendment No. 1" dated November 17, 2010 (collectively, the "APA").

4. The sale transaction ("Sale") between SR and the Debtors was approved by the bankruptcy court on November 19, 2010 ("Sale Order"), and the Sale eventually closed on December 8, 2010. The purchase price approved for the Assets was ***$33,125,000 cash*** (subject to certain possible purchase price adjustments),[2] plus certain "Assumed Liabilities."

5. Apparently all is not well that ends well. This Adversary Proceeding was subsequently filed by the Debtors, as Plaintiffs, against the purchaser SR, as Defendant, ***after*** the Sale closed, on March 30, 2011. The Debtors alleged in the Adversary Proceeding that SR had breached the APA (pre-closing) and sought a declaratory judgment in connection with a purchase price adjustment controversy.[3]

6. With regard to the alleged pre-closing breach of contract, this revolved around certain environmental testing that the Defendant undertook on the Debtors' oil and gas properties as

---

[2] As herein further explained, the parties agreed to a procedure allowing for possible adjustments to the purchase price, including a downward purchase price adjustment for environmental defects that might be identified. Section 2.04(b)(iii) of the APA.

[3] Bankruptcy courts and, no doubt, creditors often wonder how those pesky "purchase price adjustments" are going to play out down the road—particularly given the speed at which bankruptcy sale transactions frequently need (or are chosen) to be pursued. It is, no doubt, frequently not "pretty" (as far as the adjustments that ultimately get proposed).

part of the Defendant's due diligence leading up to the closing
of the Sale.  The Defendant employed Carr Environmental Group,
Inc. ("Carr") as an environmental consultant.  Carr's
environmental testing conducted for Defendant SR (which was
summarized in a report submitted to the Debtors) indicated that
there were $2,896,000 worth of environmental defects ("Identified
Claims") associated with the Assets.  Pursuant to procedures set
forth in the APA (*i.e.,* in Article XI thereof), Defendant
submitted a "Defect Notice" (herein so called) to the Debtors
prior to the closing on the Sale (and prior to the bankruptcy
court approving the Sale), on November 11, 2010, putting the
Debtors on notice of these alleged environmental defects (which,
as explained later herein, might entitle Defendant SR to a
purchase price adjustment in the amount of $2,896,000; the full
amount is now being held in escrow).[4]  The Debtors responded to
the November 11, 2010 Defect Notice on November 24, 2010 (**after**
the November 19, 2010 bankruptcy court approval of the Sale),
indicating that they disputed the existence of defects;[5]
disagreed with the amounts associated with the alleged defects;
reserved the right to cure defects; and, **finally, indicating that
the Debtors believed that the Defendant SR had breached certain**

---

[4] *See* Section 11.01(a) of the APA.

[5] The Debtors actually disputed all of Defendant SR's asserted
defects except certain ones in an aggregate amount of $51,000.

-4-

***covenants applicable to the Defendant SR in the APA by***

***undertaking invasive environmental testing on the Assets*** (when

only non-invasive "Phase I" environmental testing was allegedly

permitted).

7.    The Debtors elaborated in the Adversary Proceeding that,

of the $2,896,000 of alleged environmental defects identified by

Carr, a vast majority of them ($2,165,000 in amount) were

uncovered through the allegedly prohibited, invasive testing.

Thus, the Debtors have argued:  (a) breach of contract (*i.e.,* the

APA) by Defendant SR for performing the invasive testing (citing

both Sections 5.05(b) and 7.04 of the APA as unambiguously

prohibiting invasive testing); and, also (b) that the alleged

defects uncovered through the prohibited, invasive testing are

not eligible for the purchase price adjustment and that Defendant

SR, *ergo*, is not entitled to the escrow.  The Debtors have sought

a declaratory judgment:  (i) on the breach of contract claim;[6]

(ii) that Defendant SR is not entitled to a purchase price

adjustment on account of the defects uncovered through prohibited

---

[6] Initially, the Debtor's Complaint contained a specific count
(Count 1) for breach of contract and appeared to seek damages for
same.  After the hearing on the Motion to Dismiss, Plaintiff filed an
Unopposed Motion to Amend Complaint, in which Plaintiff sought leave
from the court to delete the breach of contract damages claim [DE #
38].  The court signed an order granting the motion on October 5, 2011
[DE # 42].  Thus, the current version of the complaint (the
"Complaint") merely seeks a declaratory judgment as to breach of
contract and does not appear to seek separate damages—except for,
perhaps, Plaintiffs' attorneys fees and costs associated with bring
the Adversary Proceeding and seeking a declaratory judgment.

testing; (iii) that turnover to the Debtors of the escrow funds in the amount equal to at least $2,165,000 is required—*i.e.,* the amount of the defects identified from invasive testing; and (iv) that any arbitration between the parties regarding the Defect Notice and the alleged remediation costs shall **not** include those alleged defects identified in the invasive testing.

8. On May 6, 2011, after the commencement of the Adversary Proceeding, the court confirmed the Debtors' Amended Joint Plan of Liquidation ("Plan"). The effective date of the Plan occurred on May 13, 2011. In connection with the Plan, a liquidating trust ("Liquidating Trust") was created and the Adversary Proceeding, among other things, was assigned to the Liquidating Trust. Jason Searcy was appointed as the trustee ("Liquidating Trustee") of the Liquidating Trust and permitted to substitute in as the proper Plaintiff in this Adversary Proceeding on July 8, 2011.

9. Defendant SR now argues in its Motion to Dismiss that: (a) Defendant did not breach the APA by conducting the Phase II testing (asserting that Section 7.04 of the APA is essentially the germane provision, and it did not **prohibit** the Phase II testing—it simply provided that the Debtors were **not obligated** to provide access for Phase II testing but did not prevent the Defendant from asking for such access or the Debtors granting such access); and (b) any breach of contract claims did not

-6-

survive the closing (referring to Section 2.13 of the APA as an anti-survival clause and the doctrines of *res judicata* and collateral estoppel).

**B.  Relevant Provisions of the APA.**

There are many provisions of the APA that are somewhat relevant.  In addition to the all-important "Definitions" that are contained in Exhibit A to the APA, at least the following provisions of the APA are pertinent to this dispute:  Sections 2.03 (second sentence); 2.04(b)(iii); 2.13; 5.05(a)-(b); 7.04; 8.03; 9.01; and 11.01.  Set forth below are the provisions of the APA that seem most relevant to the Motion to Dismiss (all emphases have been added):

**ARTICLE V**
**COVENANTS OF THE DEBTORS**[7]

**5.05(a)**-"Each ***Debtor shall afford Buyer*** and its authorized representatives from the date hereof until the Closing Date, during normal business hours, reasonable access to the Properties . . ."

---

[7] Article V is not only entitled "Covenants of ***the Debtors,***" but, almost without exception, all of the specific subsections in Article V of the APA relate to actions ***the Debtors*** were required to take or were prohibited from taking in connection with the APA.  For example, ***the Debtors*** were required to preserve their Assets until consummation of the Sale (Section 5.01).  ***The Debtors*** were restricted to a certain extent from negotiating with other purchasers (Section 5.02).  ***The Debtors*** were required to assist SR in taking over as operator of the Assets (Section 5.03).  ***The Debtors*** were required to take certain steps relating to assumption and assignment of executory contracts (Section 5.04).  Germane to the dispute in this Adversary Proceeding, ***the Debtors*** were required to allow SR reasonable access to the Assets to conduct environmental due diligence (Section 5.05).

**5.05(b)**–"Buyer shall have **the opportunity** to conduct at its expense a non-invasive environmental assessment (which shall not include invasive testing of the soil, groundwater, surface water, air and other environmental media and of building materials, equipment or facilities) of the Properties . . . which would be conducted by a reasonable and prudent purchase under the same or similar circumstances ('Phase I Assessment'). **Debtors will provide reasonable access** for this purpose to the Properties . . . ."

**5.05(d)**–"Buyer shall protect, defend, indemnify and hold each Debtor . . . harmless from and against any and all claims and losses caused directly or indirectly by the acts or omissions of Buyer . . . in connection with any due diligence conducted pursuant to or in connection with this Agreement, including any site visits and environmental assessments conducted. . .; provided, however, that this provision shall not apply to any environmental claim of Debtor discovered by Buyer through due diligence."

## ARTICLE VII
## COVENANTS OF THE BUYER AND THE DEBTORS

**7.04**–"in no event shall **the Debtors be obligated to provide** . . . access for any **invasive** environmental testing of any property and Buyer **shall not be entitled to** conduct any invasive environmental testing at, on or under any property. Any investigation pursuant to this Section 7.04 shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of the Debtors. No information or knowledge obtained in any investigation pursuant to this Section 7.04 shall affect or be deemed to modify any representation or warranty made by any Party hereunder."

## ARTICLE II
## PURCHASE AND SALE

**2.13**–"The representations and warranties contained herein . . . shall terminate upon and not survive the Closing and there shall be no liability thereafter in respect thereof. Each of the covenants of the Parties hereto contained in this Agreement shall terminate upon the Closing except to the extent that performance . . .

is to take place after Closing."

## ARTICLE IX
## TERMINATION

**9.01(e)(ii)**–"Subject to the penultimate sentence of this <u>Article IX</u> [not applicable; deals with break up fee], this Agreement may be terminated at any time prior to the Closing . . . by the Debtors if . . . Buyer shall have breached any of its representations or warranties or failed to perform or comply with any covenants or agreements contained in this Agreement . . . and the Debtors shall have given at least ten days written notice to Buyer to cure such breaches and failures but such condition remains unsatisfied".

## ARTICLE XI
## DEFECTS; FINAL ACCOUNTING

**11.01**–"Defects.  If Buyer intends to assert that there are one or more Defects giving rise to a reduction in the Purchase Price . . . Buyer must deliver to the Debtors . . . written notice of all Defects asserted by Buyer (a 'Defect Notice') setting forth . . .a description of each Defect . . . ."

**11.02–**"Resolution of Defects.  (a) If Buyer delivers a Defect Notice . . . the Debtors shall have ten (10) Business Days after the Debtors' receipt of a Defect Notice to object to any Defect and any Asserted Defect Amount as set forth in the Defect Notice . . ."

**11.04–**"Cure; Purchase Price Adjustment.  (a) The Debtors may, at their option, . . . (ii) [elect to include a Defect Amount as a Purchase Price Adjustment; cure Identified Claims; retain the property with the Defects.] . . .(d) If . . . the Asserted Defect Amount (as set forth in the Defect Notice) would result in a Defect Excess calculated . . . in excess of $8,000,000 . . . Debtors may terminate this Agreement without Liability or further obligation of Debtors to Buyer."

## ARTICLE XII
## ARBITER

**12.01**–"Engagement of Arbiter.  In the event the Parties are unable to reach agreement on any Disputed Defect

Claim in accordance with Article XI, the Buyer and the
Debtors or Liquidating Trustee shall engage an . . .
Arbiter [with details enumerated]."

## C. Legal Standards Applicable to the Motion to Dismiss.

In evaluating a Motion to Dismiss under Rule 12(b)(6), a
complaint is to be charitably construed, with all well pleaded
factual allegations being accepted as true, and with any
reasonable inferences from those facts being drawn in favor of
the non-moving party. *See Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 554-556 & 569 n. 14 (2007). Moreover, "factual allegations
must be enough to raise a right to relief above the speculative
level on the assumption that all the allegations in the complaint
are true (even if doubtful in fact)." *Id.* at 555-556. In 2009,
the Supreme Court clarified the *Twombly* pleading standard and
elaborated that, to survive a motion to dismiss, a civil
complaint must contain sufficient factual matter, accepted as
true, to "state a claim to relief that is plausible on its face."
*Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949-1951 (2009) (the Court
also affirmed the *Twombly* two-pronged approach to deciding
motions to dismiss: first, determine what is a factual allegation
versus a legal conclusion, as only factual allegations will be
accepted as true; and second, determine whether the factual
allegations state a plausible claim for relief).

In analyzing a motion to dismiss, a court may review the
pleadings on file, including all attachments. *Collins v. Morgan*

-10-

*Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Here, the APA is an attachment to the Complaint. A court may dismiss a breach of contract action under Rule 12(b)(6) when a review of the contract at issue fails to provide the recovery sought by the plaintiff. When interpreting a contract, "courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Finally, with regard to the doctrines of *res judicata* and collateral estoppel, these defenses may be raised in a Rule 12(b)(6) motion to dismiss when the grounds for such preclusion appear on the face of the complaint or consist of matters shown from the court's own records. *See, e.g., Clark v. Amoco Prod. Co.,* 794 F.2d 967, 970 (5th Cir. 1986) (noting that Federal Rule 12(b)(6) may be utilized in cases in which a successful affirmative defense appears clearly on the face of the pleadings).

## D. Ruling and Reasons.

Analysis of the Complaint and the Motion to Dismiss essentially boils down to the following two issues: (a) first, whether there is a plausible claim that Defendant SR breached the APA; (b) second, whether, even if there could be a plausible claim that Defendant SR breached the APA, the Plaintiff is now precluded from urging such a claim and seeking relief in this

court.

The court concludes, upon a review of the APA, that there cannot be a claim that Defendant SR breached the APA in doing Phase II invasive environmental testing because Phase II invasive environmental testing was not *prohibited* by the APA. The court further concludes that, even if Phase II invasive environmental testing was prohibited, any breach of a covenant by Defendant SR (by doing Phase II invasive testing) cannot now form a basis for relief in this court after the closing of the Sale transaction. This means Plaintiff is now prohibited from pursuing this Adversary Proceeding.

### i. Plaintiff has not made a claim of breach of contract that is plausible on its face.

First, reading the provisions of the APA collectively, the court concludes there was no prohibition on invasive testing by the buyer, such that there could be a breach of contract claim if invasive testing was performed by the buyer. Rather, the APA unambiguously provided that the Debtors had *no obligation themselves to provide access* for invasive testing and the buyer was not *"entitled"* to the opportunity to engage in invasive testing. The court does not believe that one can plausibly argue that the phrase "*shall not be entitled to conduct* any invasive environmental testing" equates with "*shall not conduct* any invasive environmental testing." *See* Section 7.04 of APA. The

-12-

latter phrase is a **prohibition**. But the former phrase (which is the one used in the APA) is a declaration that Defendant SR had no entitlement[8] to do invasive testing. But never did Defendant SR covenant or agree **not** to conduct invasive testing. Never does the APA state that SR "shall not" conduct invasive testing. This interpretation (of there being no outright prohibition on SR doing invasive testing) is in harmony with Article V of the APA ("Covenants of the Debtor"), which merely states that **the Debtors** were obligated to give reasonable access to SR for noninvasive testing and that SR "shall have the opportunity to conduct a non-invasive environmental assessment." *See* Section 5.05(b). The APA is only worded in terms of what the Debtors were required to give buyer the **opportunity** to do. But there was never an outright prohibition on Defendant SR undertaking extra expense and extra time to do Phase II invasive testing (the Debtors need not have given Defendant SR the opportunity; but SR was not prohibited). And clearly, the Defendant SR acted somewhat at its own peril in undertaking more extensive, invasive due diligence, since Defendant SR would be obligated to indemnify the Debtors if Defendant SR or Defendant SR's agents committed some sort of damage to the Assets. *See* Section 5.05(d) (cited above) and

---

[8] *Black's Law Dictionary* defines "entitlement" as an "absolute right to a (usu. monetary) benefit. . ." *See Black's Law Dictionary* 612 (9th ed. 2009). Thus, Defendant SR had no **absolute right** to do invasive testing—but this is not the same as a prohibition.

Section 7.06 (dealing with "Indemnification" obligations of the buyer in the event that its site visits and due diligence harmed the Debtors). For the foregoing reason, no breach of the APA on the part of Defendant SR is plausible on its face.

    **ii. Even if Phase II invasive environmental testing was outright prohibited by the APA, any breach of a covenant by Defendant SR (by doing Phase II invasive testing) could not be a basis for damages or otherwise actionable in this court after the closing of the Sale transaction.**

Second, even if Defendant SR's Phase II testing was a breach of the APA, a lawsuit urging breach of contract by Plaintiff is not legally permissible at this juncture because the APA is unambiguous as to what the procedures and remedies between the parties were intended to be in the event that Defendant SR identified defects; closing on the Sale and then suing Defendant SR was not a permissible procedure or remedy.

The provisions of Article XI of the APA (cited above) are the relevant provisions. If the buyer intended to assert that there were one or more defects (including environmental defects) giving rise to a claim for reduction in the purchase price, buyer was required to deliver a Defect Notice no later than 5:00 p.m. on the deadline for competing bids for the Assets. *See* Section 11.01(a). There is no dispute that Defendant SR did this. Then, the Debtors had the opportunity to dispute the defects or the amounts associated with the defects with its own "Debtor Dispute

-14-

Notice" delivered to buyer within ten business days. *See* Section 11.02. There is no dispute that the Debtors did this. The Debtors also had other options. The Debtors could have opted to cure defects. *See* Section 11.01(b) & 11.04(ii). The Debtors could have accepted the Defect Notice as warranting a purchase price adjustment or even could have opted to retain Assets with alleged Defects. *See* Section 11.04(a)(ii). But here, as noted, the Debtors could and did contest the validity and amounts of most of the asserted defects with the "Debtor Dispute Notice." Thereafter, the parties were obligated to "use good faith efforts to agree on" the defects issues and if they could not agree, they were to engage an arbiter (who was required to be an oil and gas lawyer or consultant with certain credentials) as set forth in Article XII of the APA. *See* Sections 11.02(c) and Sections 12.01-12.03. The arbitration process was clearly created in a way to allow for closing of the Sale to occur, ***followed by the arbitration to decide upon whether a downward adjustment and return of part of the purchase price to SR was appropriate***.

To be clear, the Debtors had a multitude of remedies and procedures available to them under the APA in the event of problems with the Defendant SR. The Debtors could ***terminate*** the APA and refuse to close if the buyer "breached any of its representations or warranties or failed to comply with any of its covenants or agreements contained in" the APA. *See* Section

9.02(e)(ii).  And, as mentioned earlier, the Debtors certainly could have sued Defendant SR for indemnification for any losses caused to the Debtors' Assets by virtue of Defendant SR's or its agents' acts or omissions made during site visits and invasive testing.  *See* 5.05(d) and 7.06 (Debtors never alleged anything of this nature).  But all of the representations and warranties of the parties terminated at closing and there was no liability thereafter for them.  *See* Section 2.13.  And all covenants of the parties terminated upon closing (unless performance of the covenant was contemplated to take place after closing).  *Id.* While the Debtors could have terminated and refused to close if the invasive testing constituted a breach, and while the Debtors could have sued for indemnification for any damages to the situs that occurred from the invasive testing, there is simply no possible remedy or procedure in the APA that contemplates a closing on the Sale followed by a lawsuit against Defendant SR to challenge its Defect Notice because such defects were allegedly identified by means (*i.e.,* invasive testing) not expressly permitted by the APA.  Such a notion flies in the face of the concept of all representations, warranties, and covenants not surviving the Closing.  Section 2.13.  And such a notion flies in the face of the agreement that an arbiter would determine all issues regarding environmental defects.

-16-

### iii. Estoppel/Preclusion.

Finally, Defendant SR has argued that the Debtors' representations at the bankruptcy court sale hearing and, also the Sale Order itself, preclude the Plaintiff from now taking the position in court that Defendant SR breached the APA. Specifically, the Debtors represented at the Sale hearing that Defendant SR "acted in good faith in the sale process." Exs. 2 & 4 from Sale hearing. The court signed a Sale Order that also contained a finding that Defendant SR was a "purchaser in good faith." Defendant SR argues that the "good faith purchaser" label in a Section 363 context speaks not just to the buyer's conduct in bidding in a fair and noncollusive manner, but also speaks to the overall integrity of the buyer's conduct in the entire sale proceeding. *E.g., In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). Defendant SR argues that a debtor cannot, on the one hand, represent to the court that a buyer is a good faith purchaser, while, on the other hand, (a) holding back from the court its belief that the buyer has breached the sale contract; and (b) planning to sue the buyer after closing of the sale.

In response to this argument, Plaintiff has essentially argued that a representation and finding of "good faith" in the Section 363 context is not tantamount to a representation by the seller nor a finding by the court that the buyer has not somehow

-17-

committed a breach of contract.

There are various estoppel/preclusion doctrines that arguably might apply here:  collateral estoppel (a.k.a. issue preclusion); *res judicata* (a.k.a. claim preclusion); judicial estoppel; equitable estoppel; waiver; promissory estoppel; and quasi-estoppel.  The court concludes that ***judicial estoppel*** is the relevant estoppel doctrine that does, indeed, apply here. Courts have stated that judicial estoppel is an equitable remedy that should be applied flexibly, with an intent to achieve substantial justice.  . . . Application of the doctrine should be guided by a sense of fairness, with the facts of a particular dispute in mind."  *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011).  The concern of the doctrine is "to avoid unfair results and unseemliness."  *Id.*

According to long-established case law, in considering the applicability of judicial estoppel, there are three traditional factors that must be analyzed by a court: (1) whether a party's later position (made in a judicial proceeding) is clearly inconsistent with its earlier position (also made in a judicial proceeding); (2) whether the party has succeeded in persuading a court to accept that party's earlier position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or it would impose an unfair detriment on the opposing party if not estopped.  *Save Our Springs (S.O.S.)*

*Alliance, Inc. v. WSI (II)-COS, L.L.C. (In re Save Our Springs (S.O.S.) Alliance, Inc.), 632 F.3d 168, 175 (5th Cir. 2011)* (citing *Peoples State Bank v. Gen. Elec. Capital Corp.* (*In re Ark-La-Tex Timber Co.*), 482 F.3d 319, 332 (5th Cir. 2007) & *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)). Some courts have phrased judicial estoppel as a four-part test, consisting of evaluating whether: (1) a sworn, prior inconsistent statement was made in a judicial proceeding; (2) the party now sought to be estopped successfully maintained the prior position; (3) the prior inconsistent statement was not made inadvertently or because of mistake, fraud, or duress; and (4) the statement was deliberate, clear and unequivocal." *Owen v. Knop*, 853 S.W.2d 638, 641 (Tex. App.—Corpus Christi 1993, *writ denied).*

"Unlike equitable estoppel, judicial estoppel is not grounded in the elements of detrimental reliance or injury in fact, but arises from positive rules of procedure based on justice and sound public policy." *Long v. Knox*, 291 S.W.2d 292, 295 (Tex. 1956). "The doctrine of judicial estoppel prohibits parties from deliberately changing positions according to the exigencies of the moment; it is designed to protect the integrity of the judicial process." *Peoples State Bank v. Gen. Elec. Capital Corp. (In re Ark-La-Tex Timber Co.)*, 482 F.3d 319, 332 (5th Cir. 2007). "Because the doctrine [of judicial estoppel] is intended to protect the judicial system, rather than the

litigants, detrimental reliance by the opponent of the party against whom the doctrine is applies is not necessary." *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 205 (5th Cir. 1999). The policy behind judicial estoppel is to prevent "internal inconsistency, [preclude] litigants from playing fast and loose with the courts, and [prohibit] parties from deliberately changing positions according to the exigencies of the circumstances." *Id.* at 206.

The court, on balance, agrees with Defendant SR that the Debtors' representations at the bankruptcy court sale hearing—and also the Sale Order itself (submitted by the Debtors)—now preclude the Plaintiff from taking the position in court (through this Adversary Proceeding) that Defendant SR breached the APA. While the court does not believe that the Debtors played "fast and loose" with the court or acted with any unseemliness, the Debtors did make clear, deliberate and unequivocal statements that the Defendant SR acted in good faith. This implied that Defendant SR not only paid a fair price and acted without collusion or improper behavior, but also that there was integrity and no taint in the overall process. A known, potential breach of contract by the winning bidder, that might lead (in the Debtors' view) to an improper assertion of a more-than-$2 million purchase price adjustment, was, in this court's estimation, significant enough for all parties and the court to consider it

-20-

before approving the Sale.  The court is not opining that a "good faith purchaser" finding will *always* preclude any and all claims that somehow might emerge post-closing (particularly with regard to a claim that was unknown and undiscoverable pre-closing). But, here, Debtors' statements to the court and Sale Order submitted should be deemed preclusive.  The Plaintiff's position now that Defendant SR breached the APA by undertaking invasive testing and has asserted improper purchase price adjustments clearly seems inconsistent with the Debtors' silence on these issues to the court at the Sale hearing (and the Debtors' statement that the "bidders acted in good faith in the sale process").  Moreover, the Debtors "succeeded in persuading a court to accept" their earlier position that Defendant SR was a good faith purchaser by obtaining the Sale order from the court. Additionally, the court believes that the bankruptcy estate would derive an unfair advantage and it would impose an unfair detriment on Defendant SR if the court did not apply estoppel in this context.[9]  Finally, the estoppel doctrine applies to the Plaintiff as the successor party to the Debtors.

---

[9] Unlike in the recent case of *Reed v. City of Arlington*, there do not seem to be innocent creditors that are unfairly caught in the cross hairs here.  It is clear from the record that the Debtors' lender (who would be the one to benefit, under the Plan, from allowing the Debtors' Adversary Proceeding to go forward) knew—just like the Debtors—of the breach-of-contract argument at the time of the Sale hearing.

**E.** **Conclusion.**

Accordingly, for the reasons set forth above, the Motion to Dismiss is granted, as the Plaintiff has failed to state a claim upon which relief can be granted in this Adversary Proceeding. No breach of contract claim is plausible. Moreover, such a claim, if plausible, would at this juncture be precluded. The parties are hereby authorized to arbitrate the Defect Notice, in accordance with the procedures set forth in the APA.

**IT IS SO ORDERED**.

***END OF MEMORANDUM OF OPINION AND ORDER***